Argued and submitted February 22, reversed and remanded May 3, 2006

STATE OF OREGON,
*Respondent,*

*v.*

LISA IRENE ACREE,
*Appellant.*

0305132CR; A124279

134 P3d 1069

David Ferry, Deputy Public Defender, argued the cause for appellant. With him on the brief were Peter Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Anna M. Joyce, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Ortega, Judge.*

BREWER, C. J.

---

\* Ortega, J., *vice* Ceniceros, S. J.

## BREWER, C. J.

Defendant appeals her conviction after a jury trial for possession of a Schedule II controlled substance. In a single assignment of error, she asserts that the trial court erred in denying her motion for a new trial based on newly discovered evidence. ORCP 64 B(4); ORS 136.535. Assuming that the trial court made no predicate legal error, we review the court's decision for an abuse of discretion. *Oberg v. Honda Motor Co.*, 316 Or 263, 272, 851 P2d 1084 (1993), *rev'd on other grounds*, 512 US 415, 114 S Ct 2331, 129 L Ed 2d 336 (1994). We reverse and remand.

Defendant was charged with a single count of possession of a Schedule II controlled substance. At defendant's jury trial, the parties adduced the following evidence. In May 2003, defendant resided in a home that her deceased father had owned and that was the primary residence of defendant's sister, Rayne. Federal authorities executed a search warrant at the residence as part of a federal investigation. During the search, officers discovered drug paraphernalia. The search under the federal warrant was stopped, and local officers applied for and obtained a state search warrant for narcotics. On May 7, Deputy Needham was part of a team that executed a search warrant at the residence. The search of the home was videotaped. However, the videotape was unavailable at the time of trial because it was being held as evidence in the federal case.

Needham testified that he had had contact with defendant at the residence for several years "off and on." The residence has two bedrooms, which Needham described as "bedroom 1" and "bedroom 2." Needham testified that defendant resided in bedroom 2. There were two dressers in bedroom 2, which Needham labeled "dresser 1" and "dresser 2." In the top drawer of dresser 1, Needham found a "snort tube" used for ingesting methamphetamine or cocaine. The snort tube had a significant amount of white powdery substance on the inside, which Needham believed was the residue from a large amount of narcotics passing through the body of the tube. The residue later tested positive for methamphetamine. In bedroom 1, Needham found another snort tube on top of a dresser. The residue from that tube also tested positive for methamphetamine.

Deputy Needham also testified that he found a set of digital scales in a curio cabinet located in the living room of the residence. Needham testified that the cabinet did not have doors and that the shelves were in plain view. The prosecutor asked Needham if the "scales [were] hidden by any kind of objects?," and Needham answered, "No, they were not. They were at the front corner of the shelf that they were being held on." Needham noticed a white powder residue on the scales; the residue later tested positive for methamphetamine. Needham testified that methamphetamine stays in the system for 24 to 36 hours. Defendant, who was not home at the time of the search, submitted to a drug test six days after the search, and she tested negative for methamphetamine.

Rayne testified that the house had been hers since her father died in early 2002. Rayne testified that defendant had lived in the house for a time, helping to care for their father, but had moved out at the end of January or beginning of February 2002. In November or December 2002, defendant needed a place to sleep after she was no longer able to sleep in her trailer, and she began staying overnight again in the residence. According to Rayne, defendant "didn't have the run of any of the house at all." Rayne stated that defendant slept in bedroom 2. However, Rayne testified that she only allowed defendant to use one of the dressers in the bedroom, the one that Needham described as dresser 2. Rayne testified that she continued to use dresser 1, where the snort tube was found, and that defendant would not have known that the tube was there. Rayne also testified that the scales were hers and that she did not think that defendant knew the scales were there. Rayne admitted using methamphetamine, that she had tested positive for it when she was arrested, and that she had pleaded guilty to possession of the drug residue at issue in this case. Rayne also testified that defendant did not use alcohol or drugs.

During closing arguments, the prosecutor argued that the jury could find defendant guilty of possession of a controlled substance under either of two theories: constructive possession or actual possession. The prosecutor further argued that, because the scales were found in the living room in "plain view," and defendant was staying in the bedroom where the snort tube was found, the jury could find her guilty

of constructively possessing methamphetamine. The prosecutor asserted that "[t]he State doesn't have to prove the defendant agrees with the use of drugs. The State just has to prove that the defendant knew that the scales were in the house and that there was residue on it, and the defendant knew about the snort tube." However, the prosecutor also argued that the jury could convict defendant of actually possessing the snort tube that was found in the dresser in her bedroom.

The jury convicted defendant of the single count charged. On the day of her sentencing hearing, defendant filed a motion for a new trial. In the motion, defendant asserted that the execution of the search warrant had been videotaped but that the videotape was in the possession of federal authorities at the time of trial. The videotape, which had since been made available to defendant's attorney, showed that the scales were not in plain view on the shelf of the curio cabinet but were instead covered by a small jacket. Defendant asserted that the video showed that Needham's testimony had been inaccurate and that his veracity had been critical to the jury's decision in the case.

The video camera had an audio feature. As the camera recorded in the living room, an unseen man's voice stated, "We've got some digital scales, [Deputy Needham]." Needham, who at the time was filming a different part of the living room, said "OK," and panned the camera around to the curio cabinet. The videotape shows that, contrary to Needham's testimony, the cabinet had glass doors. The doors were pulled open. The camera then focused on a shelf in the cabinet, where a child's or doll's coat was located. An unidentified person then lifted the coat, revealing the digital scales beneath. The videotape did not show any other parts of the cabinet besides the area where the scales were found.

The trial court denied defendant's motion for a new trial. Preliminarily the court determined that "Defendant could not and did not raise claims of exculpatory evidence, because the Defendant had not known of and had not viewed the tape." The court found that the videotape showed that the scales were covered by a small child's coat but that Needham "never testified the scale was in plain view, just that it was

found. There was no inconsistency." The court also noted that the state had filed a motion to postpone the trial the day before it was set to commence and that defendant had not objected to the motion. The court noted that the state indicated that the videotape existed but asserted that the state was unable to obtain a copy before the trial date. The court concluded that, comparing the benefit of the video with the balance of the evidence adduced at trial, defendant's rights were not substantially affected. Defendant appeals from the denial of her motion for a new trial. *See* ORS 138.071(2).

ORCP 64 B[1] provides, in part:

"A former judgment may be set aside and a new trial granted in an action where there has been a trial by jury on the motion of the party aggrieved for any of the following causes materially affecting the substantial rights of such party:

"* * * * *

"B(4) Newly discovered evidence, material for the party making the application, which such party could not with reasonable diligence have discovered and produced at the trial."

In *State v. Arnold*, 320 Or 111, 120, 879 P2d 1272 (1994), the Supreme Court held that newly discovered evidence under ORCP 64 B(4)

"that may justify a court in granting a new trial must meet the following requirements:

"(1)   It must be such as will probably change the result if a new trial is granted;

"(2)   It must be such as, with reasonable diligence, could not have been discovered before or during the trial;

"(3)   It must be such that it cannot, with reasonable diligence, be used during trial;

"(4)   It must be material to an issue;

"(5)   It must not be merely cumulative;

---

[1] ORS 136.535 provides that "[e]xcept that a new trial may not be granted on application of the state, ORS 19.430 and ORCP 64 A, B and D to G apply to and regulate new trials in criminal actions."

"(6)  It must not be merely impeaching or contradicting of former evidence."

(Footnote omitted.) The first three requirements are independently essential, whereas the last three requirements are closely related to the first. *State v. Toth*, 30 Or App 285, 289-90, 566 P2d 1218 (1977).

The last five requirements are not at issue in this case. The trial court's unchallenged determination that defendant "could not and did not raise claims of exculpatory evidence," because she had not known of and viewed the tape, satisfies the second and third requirements. As to the fourth requirement, the primary issue in dispute was whether defendant knew that the contraband was located in the house. The evidence against defendant included Needham's testimony that the scales were visible in the curio cabinet in the living room. The state argued that defendant should be found guilty of constructively possessing the scales based on that evidence. Moreover, in support of the state's motion to postpone the trial based on the unavailability of the videotape, the prosecutor opined that "[o]btaining this evidence may be dispositive of this case, if it shows that the controlled substances were not in plain view or in a place that would indicate knowledge by the defendant." Because the videotape established that the scales were not openly visible at the time of the search, the evidence was material to the state's theory of constructive possession. For the same reason, the evidence was not cumulative, rather it was inconsistent with the state's theory, nor was it "*merely* impeaching or contradictory of former evidence." (Emphasis added.) Although the videotape evidence would have contradicted Needham's testimony, it would have done more: it would have directly rebutted the state's theory of guilt with respect to defendant's reputed constructive possession of the scales. Accordingly, the evidence also satisfied the fifth and sixth requirements.

The issue thus reduces to whether the evidence satisfied the first requirement, that is, whether it "will probably change the result if a new trial is granted." It is that issue on which the parties primarily focus their arguments on appeal. We first note that there inheres in the words "will probably" an internal tension that the cases do not emphasize. The

word "will" connotes certainty, whereas "probably" ordinarily means that a particular result is more likely than not to occur. Taken together, the words have a less clear meaning. However, we need not detain ourselves unnecessarily with that concern. In *State v. Davis*, 192 Or 575, 579, 235 P2d 761 (1951), a case on which the Supreme Court relied in *Arnold*, the court explained that, to demonstrate that newly discovered evidence "will probably" change the result of a new trial, the movant bears the burden of submitting "supporting affidavits [that] show a state of undisputed facts which would probably lead an ordinarily reasonable person to a different conclusion from that arrived at by the jury[.]" Accordingly, it is apparent that the court intended to adopt probability, not a heightened measure, as the standard for determining whether newly discovered evidence would change the result in a new trial.[2]

We conclude that the videotape evidence probably would have led a reasonable person to a different conclusion from that reached by the jury. Although the prosecutor asserted in closing argument that the jury could find that defendant actually possessed the snort tube in the dresser, the state's primary theory was that defendant constructively possessed the scales and the snort tube. The evidence of guilt in this case was not strong. Defendant was not a permanent resident of the home in which the drug evidence was found. No physical evidence was presented that defendant ever touched any of the items found in the search, and there was

---

[2] Interestingly, the source of the "will probably" formulation does not derive from the text of any Oregon statute, past or present. It first appeared in *State v. Hill*, 39 Or 90, 94-95, 65 P 518 (1901), where the court said:

"Newly-discovered evidence which will justify a court in setting aside a verdict and granting a new trial must fulfill the following requirements: '(1) It must be such as will probably change the result if a new trial is granted; (2) it must have been discovered since the trial; (3) it must be such as could not have been discovered before the trial by the exercise of due diligence; (4) it must be material to the issue; (5) it must not be merely cumulative to the former evidence; (6) it must not be merely impeaching or contradicting the former evidence' : 14 Ency Pl. & Pr. 791; *Berry v. State*, 10 Ga 511."

The court in *Arnold*, following the statutory construction methodology of *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), held that, because ORCP 64 B(4) was textually identical to a previous statute that the court had construed in *Davis*, the construction that the court adopted in that case retained its validity in the construction of ORCP 64 B(4). *Arnold*, 320 Or at 119-21.

no direct evidence that defendant even knew that they existed. The only evidence probative of defendant's guilt was Needham's testimony that the scales were found in plain view in the living room and that the dresser in which the snort tube was found was located in the bedroom where defendant slept. On the other hand, defendant's sister admitted her own guilt to the crime of possession of the controlled substances at issue in this case, and she testified that the drugs were hers, not defendant's, and that defendant did not know that they were present.

Thus, the strength of the state's case boiled down to whether the jury believed Needham's testimony or defendant's sister's testimony, and if the jury believed Needham, whether the jury would infer beyond a reasonable doubt that the visibility of or defendant's access to the contraband was sufficient to establish that she possessed them. The video-tape evidence probably would have changed the jury's decision on both points because it undermined the state's theory that the scales were openly visible, and it showed that Needham was mistaken in critical aspects of his testimony. It also supported defendant's theory that she easily could have stayed in the residence without noticing the contraband because it was not open to view.

The trial court did not consider the evidence in the foregoing light, probably because the court did not accurately recall Needham's testimony. As noted, the court recalled that Needham "never testified the scale was in plain view, just that it was found. There was no inconsistency." However, there was an inconsistency. Although Needham only used the term "plain view" to describe the shelves in the cabinet, when the prosecutor asked Needham if the "scales [were] hidden by any kind of objects?," he answered, "No, they were not. They were at the front corner of the shelf that they were being held on." The prosecutor clearly understood Needham's testimony to constitute an assertion that the scales were found in plain view, because she so stated in closing argument. We share that understanding of Needham's testimony and are satisfied that the jury would have shared it as well.

The state remonstrates that the audio portion of the tape "clearly indicates that someone was apparently able to

see the scales, even though they were under the child's/doll's coat." According to the state, "someone must have been able to see the scales, perhaps from a different angle, because that person told Deputy Needham that—while the coat was still on the shelf—he could see digital scales." The state correctly describes the audio portion of the tape. However, for two reasons we are not persuaded by its argument. First, although it is logical to make the inference, it is not obvious that the person who pointed out the scales could see them when the video was filmed. That person could have previously lifted the coat and observed the scales. In short, the video does not make absolutely clear when and how the person first observed the scales. Second, what is more important is what the videotape does conclusively depict: that, if the scales were not completely hidden by the coat at the time of the search, they were so extensively covered that a person staying in the house easily might not have known they were present. The evidence thus is inconsistent with Needham's testimony, inconsistent with the prosecutor's closing argument, and it would have substantially undermined the state's theory that defendant constructively possessed the scales and the drug residue they contained. Although the state still had the fallback theory that defendant possessed the snort tube, that theory was weaker from the outset. The snort tube was covered by clothes in the drawer of a dresser that the state could not necessarily connect to defendant, a temporary occupant of the bedroom in which it was located. Moreover, once the accuracy of Needham's testimony about the visibility of the scales was called into question, the jury may have been more likely to credit Rayne's testimony that defendant did not know that any drug paraphernalia was present in the house.

As the prosecutor stated in her affidavit in support of the state's motion to postpone the trial, "[o]btaining [the videotape] may be dispositive of this case, if it shows that the controlled substances were not in plain view or in a place that would indicate knowledge by the defendant." We agree. We conclude that the videotape constituted newly discovered evidence that would probably lead a reasonable person to a different decision from that reached by the jury. Accordingly, defendant is entitled to a new trial.

Reversed and remanded.